**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

DANIEL SOROKTI,

Plaintiff,

-against-

THE CITY OF ROCHESTER, a municipal entity, "JOHN DOE POLICE OFFICERS 1-200" (names and number of whom are unknown at present), THE COUNTY OF MONROE, TODD BAXTER, "RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names and number of whom are unknown at present), and other unidentified members of the Rochester Police Department and Monroe County Sheriff's Office, TIMOTHY NANRY,

Defendants.

21-cv-6709 (FPG)

**FIRST AMENDED COMPLAINT [JURY TRIAL DEMANDED]**

Plaintiff, by his attorneys, ROTH & ROTH, LLP and EASTON THOMPSON KASPAREK SHIFFRIN LLP, complaining of the defendants, respectfully allege as follows:

## I. PARTIES

1.      Plaintiff DANIEL SOROKTI is a resident of the Monroe County, State of New York.

2.      Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD.

3.      Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant CITY maintains the City of Rochester Police Department, a duly authorized police department,

authorized to perform all functions of a police department. RPD acts as Defendant CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

4.      "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police Officers with the RPD. At all relevant times, these defendants were acting within the scope of their employment with the CITY and RPD and under color of state law. They are sued in their individual capacities. John Doe RPD Officers are referred to collectively as "the RPD officers."

5.      Defendant COUNTY OF MONROE ("COUNTY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant COUNTY maintains the Monroe County Sheriff's Office ("MCSO") and pays the salaries of the Monroe County Sheriff and MCSO deputies. MCSO acts as Defendant COUNTY'S agent and Defendant COUNTY assumes the risks incidental to the maintenance of the MCSO as the COUNTY's police department.

6.      Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

7.      "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sheriff's Office ("MCSO"). At all relevant times, these defendants were acting within the scope of their employment with the County and

under Sheriff BAXTER and acting under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies."

8.      BAXTER is responsible for the training, supervision and discipline of the Defendant Sheriff's Deputies under state law.

9.      TIMOTHY NANRY ("NANRY") was, at all times relevant to this Complaint, a New York State Trooper. At all relevant times, he was acting within the scope of his employment and under color of state law. He is sued in his individual capacity.

## II.  JURISDICTION AND CONDITIONS PRECEDENT

10.     This Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over claims arising out of violations of the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

11.     The Court has pendent jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. §1367.

12.     Mr. SOROKTI filed timely Notices of Claim against the City and County, in compliance with the Municipal Law § 50.

13.     The CITY and the COUNTY waived 50-h hearings for Mr. SOROKTI.

14.     More than thirty (30) days have elapsed since service of said Notices of Claim were filed and the City and County have failed to pay or adjust the claim.

15.     This action is being brought within a year of the event that gives rise to Mr. SOROKTI's causes of action under New York State law and Plaintiffs have complied with all of the statutory prerequisites for bringing this action.

## III.  STATEMENT OF FACTS

### A.  Facts Common to All Causes of Action.

16.     On March 23, 2020, Daniel Prude's family sought help from the Rochester Police Department ("RPD") as Daniel was suffering an acute mental health crisis. Tragically, that call for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as an RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared brain dead that night; he was taken off life support and died on March 30.

17.     When the video of RPD Officers killing Daniel Prude was finally made public on September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

18.     On September 2-6, 2020, the defendants responded to peaceful protests with extreme violence—including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions.

19.     As detailed below, Mr. SOROKTI was injured at protests on September 3-4, 4-5, and 5-6, 2020.

**Thursday September 3 to Friday September 4, 2020**

20.     On the night of Thursday, September 3 to Friday September 4, 2020, Mr. SOROKTI was assaulted, battered and falsely arrested at a peaceful protest in the vicinity of the Public Safety Building ("PSB") and on Exchange Street near the Center City Bridge.

21.     When Mr. SOROKTI arrived, Exchange Street in the vicinity of the PSB had been closed to vehicular traffic by law enforcement.

22.     At approximately 10:20-10:30 p.m., in the vicinity of the sidewalk near the flagpole in front of the PSB, RPD officers shot Mr. SOROKTI with pepper balls.

23.     Thereafter, between approximately 10:45-11:00 p.m.,  Mr. SOROKTI was pushed and shoved by an RPD officer in the chest with a baton.

24.     Between approximately 12:00 a.m. and 12:30 a.m., RPD officers, Sheriff's Deputies and NANRY pushed Mr. SOROKTI and other protesters south on Exchange Blvd. to the vicinity south of the Center City Bridge.

25.     On September 4, at approximately 12:45 – 1:00 a.m., on Exchange Blvd. south of the Center City Bridge, RPD officers, Sheriff's Deputies and NANRY aggressively ordered Mr. SOROKTI and other protesters to "move back" as they marched at protesters and struck them with batons.

26.     While Mr. SOROKTI was complying with their orders and moving back, NANRY seized him, threw him to the ground, slammed his face into the ground, and arrested him.

27.     Upon information and belief, one or more RPD officers and/or Sheriff's Deputies assisted NANRY seize Mr. SOROKTI, throw him to the ground, slam his face into the pavement, and arrest him.

28.     NANRY and one or more RPD officers and/or Sheriff's Deputies placed handcuffs on Mr. SOROKTI's wrists in an unreasonably tight manner.

29.     At no time did Mr. SOROKTI commit any crime or violation.

30.     At no time did Mr. SOROKTI threaten law enforcement in any way.

31.     At no time did Mr. SOROKTI do anything that justified law enforcement using any force against him whatsoever.

32.     As a result of NANRY and one or more RPD officers and/or Sheriff's Deputies slamming his face into the pavement, Mr. SOROKTI suffered a broken nose.

33.     Mr. SOROKTI was arrested in the absence of probable cause for his arrest.

34.     No reasonable, properly trained officer would have believed they had reasonable or probable cause to arrest Plaintiff.

35.     No reasonable, properly trained officer would have believed they had cause or justification to use any force against Plaintiff.

36.     The RPD officers failed to document the use of force against Ms. SOROKTI in a Subject Resistance Report, which is a violation of RPD policy.

37.     All the false criminal charges levied against Plaintiff were eventually dismissed in their entirety after Mr. SOROKTI accepted an Adjournment in Contemplation of Dismissal at his first appearance in criminal court on or about September 23, 2020.

38.     As a result of  the chemical weapons Defendants used against him on September 3-4, 2020, Mr. SOROKTI sustained irritation to his skin, eyes, mouth, nose and lungs.

39.     Mr. SOROKTI also sustained pain, bruising and swelling from being shot with pepper balls, and emotional and psychological harm from being attacked and falsely arrested by RPD officers and/or Sheriff's Deputies.

**Friday September 4 to Saturday September 5, 2020**

40.     On the night of September 4-5, 2020, RPD officers and Sheriff's Deputies used the Court Street bridge to "kettle" hundreds of protesters, including Mr. SOROKTI, spray them with tear gas, attack them with pepper balls, rush them and beat them with batons—a scene tragically reminiscent of the 1965 "Bloody Sunday" attack on civil rights demonstrators on the Edmund Pettus Bridge in Selma, Alabama.

41.     RPD officers and Sheriff's Deputies first escorted peaceful protesters along Court Street from Martin Luther King Jr. Memorial Park towards the PSB, and directed them onto the Court Street Bridge. But when protesters reached the other side, law enforcement stopped them with metal barricades.

42.     After hundreds of protesters had marched onto the bridge and had nowhere to go, the police ordered the protesters to "disperse." However, the dispersal orders were not clearly communicated, and the protesters towards the back of the bridge near South Avenue could not hear the dispersal orders. Moreover, there was nowhere for the protesters in the front near the police barricades to go.

43.     Suddenly, without giving the protesters the time or opportunity to disperse—*and knowing it was physically impossible for them to comply with the dispersal orders*—law enforcement officers began violently attacking protesters. In fact, the RPD Officers began indiscriminately firing pepper balls into the crowd less than 30 seconds after the first "dispersal" order was issued at approximately 10:43 p.m

44.     When the RPD officers issued dispersal orders at on September 4 at approximately 10:43 p.m., Mr. SOROKTI was trapped near the "front line" of protesters, closest to the barricades, and it was physically impossible for him to immediately comply and leave the bridge.

45.     Less than 30 seconds after the RPD officers issued dispersal orders, Mr. SOROKTI was attacked by the RPD Officers and Sheriff's Deputies with large amounts of chemical weapons.

46.     At no time did Mr. SOROKTI commit any crime or violation.

47.     At no time did Mr. SOROKTI threaten police in any way.

48.     The RPD Officers lacked cause or any justification to or use chemical weapons or any physical force against Mr. SOROKTI.

49.     Any no time did Defendants make an individualized determination that they had cause or legal justification to use force against Mr. SOROKTI; instead, the use of force was based on perceived "group conduct."

50.     As a result of the chemical weapons Defendants used against him on September 4-5, 2020, Mr. SOROKTI sustained irritation to his skin, eyes, mouth, nose and lungs, and emotional and psychological harm from being attacked by the RPD officers and Sheriff's Deputies.

**Night of Saturday September 5 to Sunday September 6, 2020**

51.     On the night of Saturday, September 5-6, 2020, Mr. SOROKTI participated in the peaceful protest in downtown Rochester.

52.     On September 5, 2020, at approximately 10:20 p.m., the RPD Officers and Sheriff's Deputies kettled and trapped Mr. SOROKTI and hundreds of other protesters at the intersection of Broad Street and Exchange Blvd.

53.     Mr. SOROKTI was present at the back of the crowd near Main Street and Exchange Blvd. when the RPD officers issued dispersal orders, and he could not clearly make out what the officers were saying.

54.     Suddenly, without any warning, the RPD Officers and Sheriff's Deputies attacked Mr. SOROKTI and the other protesters with chemical weapons.

55.     At no time did Mr. SOROKTI commit any crime or violation.

56.     At no time did Mr. SOROKTI threaten officers in any way.

57. The RPD Officers lacked cause or any justification to or use any physical force against Mr. SOROKTI.

58. Any no time did Defendants make an individualized determination that they had cause or legal justification to use force against Mr. SOROKTI; instead, the use of force was based on perceived "group conduct."

59. As a result of the chemical weapons Defendants used against him on September 5-6, 2020, Mr. SOROKTI sustained irritation to his skin, eyes, mouth, nose and lungs. Mr. SOROKTI also sustained emotional and psychological harm from being attacked by the RPD officers and Sheriff's Deputies.

**B.  Unlawful Municipal Policies and Negligence of the City And RPD in Failing to Properly Train RPD Officers On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Officers Who Used Excessive Force Against Protesters.**

60. For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released.

61. From the very beginning, the City and RPD officials zeroed in on the fact that, unlike other protests, these were focused directly on police misconduct and racism. City and RPD officials at the highest levels subscribed to the theory that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence.

62. This manifested in the training of their officers, both before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

63. During those several months—from at least June 4, 2020 to September 2, 2020— the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

64. The violations of Mr. SOROKTI's rights are attributable to the CITY and RPD's disregard of many years of notice, criticism, and other relevant data points, both internal and external, related to its unconstitutional policing of similar peaceful protests and peaceful demonstrations.

65. Since at least the 2009, the RPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, including peaceful protests and lawful demonstrations.

66. Upon information and belief, the core training provided by the CITY related to protest response is based on crowd management and disorder control tactics for policing large-scale civil disorders and riots.

67. According to the CITY's website, the RPD's Mobile Field Force (MFF) is a "specially trained and equipped team providing a rapid, organized and disciplined response to civil disorder [and] crowd control."

68. The MFF was the RPD's primary unit tasked with policing the peaceful protests in the wake of George Floyd and Daniel Prude in May and September 2020, respectively, and on the night of September 4-5, 2020 specifically.

69.     Upon information and belief, the MFF's training and guidelines treat peaceful protests and peaceful demonstrations as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, such as disorder control formations and mass use of chemical weapons.

70.     Such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of Mr. SOROKTI.

71.     Upon information and belief, the MFF's "civil disorder" training and guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations—only for large-scale civil disorders such as riots.

72.     However, neither the MFF's "civil disorder" training and guidelines, nor, upon information and belief, any related RPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

73.     For example, upon information and belief, there is virtually no RPD training— and certainly no meaningful RPD training—focusing on how to utilize the tactics described in the MFF's "civil disorder" training and guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

74.     Many MFF members have histories of engaging in the kinds of misconduct complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

75.     Examples of the RPD's unreasonable and discriminatory use of force at prior lawful protests include:

- In October 2009, an anti-war protest in Rochester resulted in several physical confrontations, with two protesters receiving stitches at the hospital after RPD officers pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse, RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

- In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality is a deeply personal issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

- In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response, the RPD deployed, beat, shoved, and pepper sprayed protesters. As one described it: "I started to turn and they tackled me to the ground….They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures." RPD officers, in keeping

with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists: Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Over the course of one weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined.

76.     Despite the wealth of evidence of RPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in RPD training as it relates to constitutionally compliant protest policing.

77.     In fact, following the 2016 protest, the RPD and Mayor Lovely Warren's office stated the police handled themselves appropriately.

78.     When questioned by public officials after the September 2020 protests, former RPD Chief La'Ron Singletary stated that he did not review the RPD's actions at the 2016 protest in developing the RPD's strategy for responding to protests in 2020.

79.     Moreover, between a protest that occurred on May 30, 2020 and the September 2020 protests, the RPD quietly updated its departmental policy on usage of the PepperBall Launching System ("PLS"). Specifically, the Department amended the policy to allow officers on the patrol division to use the PLS. Prior to this amendment, only officers on the Special Weapons and Tactics ("SWAT") team were eligible to use PLS. The RPD did not update the policy in any other way.

80.     Under RPD General Order 630, an officer is ineligible to join the SWAT team if he has "any instance of sustained excessive force" or "serious" misconduct in his disciplinary

history. The Patrol Division (or Mobile Field Force team) does not have any such eligibility requirement.

81.     On information and belief, the Department updated this policy to ensure more officers could (and would) be able to use the PLS in anticipation of protests after the suppressed footage of RPD officers killing Daniel Prude was released. By removing any "disciplinary history check," the Department knew or had reason to know that RPD officers would use excessive force when engaging with protesters—which they did.

82.     On information and belief, the CITY and the RPD failed to provide any training to RPD officers on how to use the PLS.

83.     Any training the CITY and the RPD provided to RPD officers on using the PLS was insufficient and inadequate.

84.     The City and RPD's failure to train and improper training led to widespread excessive force at the 2020 protests, as demonstrated by RPD officers body worn camera videos, media reports, and RPD subject resistance reports.  However, Based on statements by City Officials and RPD command staff to date, and publicly available information, no RPD officer has reported any fellow officer for their unlawful use of force and no RPD officers have been disciplined for their unlawful use of force on September 2–6, 2020.

85.     The City and RPD did not simply ratify excessive force through the lack of reporting and discipline. It approved the force during the demonstrations because its policies authorized these excessive levels of force. RPD training on grenadier, MFF, and crowd control tactics, as well as its subject resistance reports, show that tear gas, pepper spray, projectiles, and grenades were supplied by superiors and deployed on their orders pursuant to RPD policies on use for force. There appears to have been no consideration given to whether such force would be

excessive to secure compliance with traffic laws or enforce violations or misdemeanors against nonviolent protestors.

86.    In summary, upon information and belief, the RPD's exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing peaceful protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of peaceful protests, let alone how to encourage or facilitate protests—despite having received clear notice that RPD policing of said protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates the City's negligence in failing to train and supervise RPD Officers in properly and lawfully policing protests to ensure that protesters' rights under the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights are not violated. As a result of the City's negligence, Plaintiff was injured and harmed, as described herein.

C.    **Unlawful Municipal Policies and Negligence of the COUNTY and Sheriff BAXTER in Failing to Properly Train Sheriff's Deputies On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Sheriff's Deputies Who Used Excessive Force Against Protesters**.

87.    Upon information and belief, for months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the COUNTY and BAXTER coordinated with the CITY and RPD to prepare for and plan their coordinated response to the anticipated large-scale protests when the video was eventually released.

88.    From the very beginning, the BAXTER and other COUNTY officials zeroed in on the fact that, unlike other protests, these were focused directly on police misconduct and racism. Like the City and RPD officials, BAXTER and other COUNTY officials at the highest levels subscribed to the theory that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence.

89.     This manifested in the training of their Sheriff's Deputies, both before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their Sheriff's Deputies was clear: there is no such thing as a peaceful protestor.

90.     Upon information and belief, during those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD coordinated with the COUNTY and BAXTER to develop a coordinated protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing

91.     Prior to September 2020, the COUNTY and BAXTER had received clear notice that peaceful protests and lawful demonstrations have occurred and will continue to occur in Monroe County, and that without proper training, his Deputy Sheriffs would violate individuals' constitutional rights and endanger the life and safety of protesters, such as Plaintiff.

92.     The COUNTY and BAXTER deliberately disregarded the fact that peaceful protests and peaceful demonstrations have occurred and will continue to occur in Monroe County, and instead has trained his Deputies that such lawful First Amendment activities constitute "civil disturbances" that mut be policed in the same manner as "violent mobs" or "riots."

93.     The COUNTY and BAXTER, upon information and belief, took no steps to train Sheriff's Deputies on lawfully policing protests and other First Amendment activities.

94.     Instead, the COUNTY and BAXTER, pursuant to the County's Hazard Mitigation Plan, trained Sheriff's Deputies that a "civil disturbance" is defined as both "peaceful demonstrations or acts of violence."

95.     Upon information and belief, the Hazard Mitigation Plan was in full force and effect at all times relevant herein.

96.     Upon information and belief, prior to 2020 and at all times relevant herein, the COUNTY and BAXTER had implemented the Hazard Mitigation Plan, and trained Sheriff's Deputies in accordance with its mandates. Thus, the COUNTY and BAXTER explicitly conflate peaceful protests and peaceful demonstration with violent riots.

97.     Upon information and belief, the COUNTY and BAXTER did not provide any training to Sheriff's Deputies on drawing a meaningful distinction between "peaceful demonstrations" and "violent mobs". For example, in its "Hazard Mitigation Plan," the County states that, "Many civil unrest incidents are spontaneous and can occur at any time, rendering prediction of probability of future occurrences difficult. When these incidents occur, they can become extremely disruptive and difficult to control. Assumedly, civil unrest incidents including marches, protests, demonstrations, and gatherings will continue to occur throughout Monroe County."

98.     According to the Hazard Mitigation Plan, peaceful protests and demonstrations are discouraged because of the perceived negative impacts on property resources, real estate and the economy; again, this is a result of the COUNTY and BAXTER falsely conflating "peaceful demonstrations" and peaceful protests with "acts of violence."

99.     Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on how to encourage and support individuals engaging in "peaceful

demonstrations" to ensure that their constitutional rights are not violated by law enforcement officers.

100.    Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on making a meaningful distinction between how Sheriff's Deputies are trained and instructed on policing "peaceful demonstrations", "peaceful protests" versus "violent mobs" and riots.

101.    Instead, the Hazard Mitigation Plan states that, "[m]any protests intended to be peaceful demonstrations to the public and the government can escalate into general chaos." Thus, upon information and belief, the COUNTY and BAXTER train Sheriff's Deputies to police peaceful demonstrations in the same manner as they would a violent mob.

102.    Like the RPD, upon information and belief, BAXTER trains Sheriff's Deputies exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations.

103.    In June 2020, several Monroe County Legislators called on BAXTER to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations. The legislators drafted a letter to County Executive Adam Bello and BAXTER in which they made a number of requests related to public safety and the safety of protesters, and closed by stating, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation, we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place to ensure the mutual safety of all involved."

104.    BAXTER claimed the letter was a "political stunt" and refused to provide any specific details regarding how Sheriff's Deputies would ensure the safety of protesters during peaceful demonstrations

105.    As a result of the COUNTY's unlawful policies, practices and customs, and BAXTER's negligence, Plaintiff was injured and harmed, as described herein.

## IV.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### Municipal Liability

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights*

106.    All preceding and subsequent paragraphs are incorporated by reference.

107.    All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed RPD officers pursuant to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the CITY's failures, and the failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite full knowledge of the their wrongful acts against Plaintiff and other protesters, as described herein.

108.    As a result of the foregoing, Plaintiff suffered injuries and damages.

### SECOND CLAIM FOR RELIEF

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' First, Fourth and Fourteenth Amendment Rights During the Summer and Fall 2020 Racial Justice Protests* **(Against the COUNTY and BAXTER)**

109.    All preceding and subsequent paragraphs are incorporated by reference.

110.    All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed MCSO employees and/or Sheriff's Deputies pursuant to: (a) formal policies, rules, and procedures of Defendants COUNTY and BAXTER; (b) actions and decisions by policymaking agents of the COUNTY and MCSO, including, but not limited to, Defendant BAXTER; (c) customs, practices, and usage of the MCSO that are so widespread and pervasive as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendants COUNTY, MCSO and BAXTER, and other policymaking officials; (d) Defendant COUNTY, MCSO and BAXTER's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by their failures, and the failures of the other policymaking agents, to train, supervise, and discipline MCSO employees and/or Sheriff's Deputies, despite full knowledge of their wrongful acts Plaintiffs and other protesters, as described herein.

111.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## THIRD CLAIM FOR RELIEF
### Excessive Force
### *Pursuant to 42 U.S.C. § 1983*

112.    All preceding and subsequent paragraphs are incorporated by reference.

113.    Defendants' actions towards Plaintiff constitutes excessive force in violation of 4th and 14th Amendments of the United States Constitution and 42 U.S.C. § 1983.

114.    Defendants used force against Mr. SOROKTI that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

115.    RPD officers and/or Sheriff's Deputies used excessive and unreasonable force against Mr. SOROKTI when they shot him with pepper balls and exposed him to various chemical weapons on September 3, 2020.

116.    NANRY, RPD officers and/or Sheriff's Deputies used excessive and unreasonable force against Mr. SOROKTI on September 4, 2020 at approximately 12:45 a.m. to 1:00 a.m. when they struck him with a baton, threw him to the ground, and slammed his face into the pavement.

117.    RPD officers and/or Sheriff's Deputies used excessive and unreasonable force against Mr. SOROKTI by subjecting him to various military grade weapons; "less-than-lethal" weapons and chemical weapons on September 3-6, 2020—including shooting him numerous times with pepper balls.

118.    The force used against Mr. SOROKTI  by defendants on the various dates complained of herein each constitutes a seizure under the 4th Amendment.

119.    The types and levels of force Defendants used against Plaintiff were in contravention of, or inconsistent with, related policies and/or training, and good and accepted police practices.

120.    As a result of their acts and omissions, Defendants deprived Plaintiff of federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

121.    The actions of the Defendants were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

122.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## FOURTH CLAIM FOR RELIEF:
### Assault and Battery

*Pursuant to New York State Law*

123. All preceding and subsequent paragraphs are incorporated by reference.

124. RPD officers assaulted and battered Mr. SOROKTI when they shot him with pepper balls and exposed him to various chemical weapons on September 3, 2020.

125. NANRY, RPD officers and/or Sheriff's Deputies battered Mr. SOROKTI on September 4, 2020 at approximately 12:45 a.m. to 1:00 a.m. when they struck him with a baton, threw him to the ground, and slammed his face into the pavement.

126. RPD officers and/or Sheriff's Deputies battered Mr. SOROKTI by subjecting him to various military grade weapons; "less-than-lethal" weapons and chemical weapons on September 3-6, 2020—including shooting him numerous times with pepper balls.

127. The types and levels of force Defendants used against Mr. SOROKTI were in contravention of, or inconsistent with, related policies and/or training.

128. The types and levels of force Defendants used against Mr. SOROKTI were in contravention of, or inconsistent with, good and accepted police practices.

129. Mr. SOROKTI was not threatening the law enforcement officers or any other person at any time relevant herein.

130. By the aforedescribed conduct, defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiff Mr. SOROKTI, when they, in a hostile and/or offensive manner struck Plaintiff without his consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

131.    The RPD Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

132.    The Defendant CITY, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

133.    At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the defendant RPD officers and/or Sheriff's Deputies against Plaintiff.

134.    The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

135.    As a result of the foregoing, Plaintiff suffered injuries and damages.

**FIFTH CLAIM FOR RELIEF**
**Unlawful Seizure / False Arrest**
***Pursuant to 42 U.S.C. § 1983***

136.    All preceding and subsequent paragraphs are incorporated by reference.

137.    NANRY, RPD officers and/or Sheriff's Deputies had no judicial warrant authorizing them to seize Mr. SOROKTI.

138.    NANRY, RPD officers and/or Sheriff's Deputies seized Mr. SOROKTI, restricting his freedom of movement, without privilege or lawful justification.

139.    Mr. SOROKTI was conscious of her confinements by Defendants.

140.    Mr. SOROKTI did not consent to being confined by Defendants.

141.    No reasonable officer would have believed they had reasonable or probable cause to seize, detain, or arrest Mr. SOROKTI.

142.    NANRY, RPD officers and/or Sheriff's Deputies did not have individualized probable cause to seize, detain, or arrest Mr. SOROKTI.

143.    NANRY, RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

144.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## SIXTH CLAIM FOR RELIEF
### Unlawful Seizure / False Arrest
### *Pursuant to New York State Law*

145.    All preceding and subsequent paragraphs are incorporated by reference.

146.    NANRY, and one or more RPD officers and/or Sheriff's handcuffed and arrested Plaintiff on September 4, 2020.

147.    The arrest was made in the absence of a warrant for the arrest.

148.    The arrest was made in the absence of probable cause for the arrest.

149.    NANRY, the RPD officers and/or Sheriff's Deputies arrested Plaintiff without having exigent circumstances for doing so.

150.    There was no other authority for the arrest of Plaintiff.

151.    Plaintiff was conscious of the arrest.

152.    Plaintiff did not consent to the arrest.

153.    NANRY, the RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

154.    The Defendant RPD officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant City and the RPD, which are therefore responsible for their conduct.

155.    The Defendant City, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

156.    As a result of the foregoing, Plaintiff suffered injuries and damages.

### SEVENTH CLAIM FOR RELIEF
**First Amendment Infringements, Including First Amendment Retaliation**
***Pursuant to 42 U.S.C. § 1983***

157.    All preceding and subsequent paragraphs are incorporated by reference.

158.    In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff of the rights protected by the First Amendment to the United States Constitution.

159.    Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to subjecting Plaintiff to excessive force, in arresting and prosecuting plaintiff, in selectively enforcing laws and regulations against Plaintiff, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

160.    Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

161.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

162.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

163.    Mr. SOROKTI's First Amendment Rights were violated, and her speech was curbed and hindered, as a result of being assaulted, battered, subjected to excessive force and falsely arrested by Defendants.

164.    Defendants' unlawful actions towards Mr. SOROKTI were motivated by the message she was expressing: calling for greater police accountability, a reallocation of funding from away from police departments and into Black and Latinx communities, the end of police brutality, and a recognition that Black Lives Matter.

165.    Defendants' actions effectively chilled and deterred Mr. SOROKTI from exercising his First Amendment Rights, as he was prevented from further protesting on the night of September 3-4, 2020 when he was arrested; and the excessive violence she was subjected to on the nights of September 3-4, 4-5 and 5-6, 2020 chilled and deterred him from engaging in future protests, for fear of being subjected to similar unlawful actions by law enforcement.

166.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

167.    As a result of the foregoing, Plaintiff suffered injuries and damages.

### EIGHTH CLAIM FOR RELIEF
**Failure To Intervene**
***Pursuant to 42 U.S.C. § 1983***

168.    All preceding and subsequent paragraphs are incorporated by reference.

169.    The individual defendants all had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights by the other Defendant RPD officers.

170.    The individual defendants failed to intervene on Plaintiff's behalf despite having had realistic opportunities to do so.

171.    The individual defendants failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

172.    As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

173.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

174.    Defendant RPD officers' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed

### EIGHTH CLAIM FOR RELIEF

**Negligent Training, Supervision and Discipline**

**(Against BAXTER)**

175.    All preceding and subsequent paragraphs are incorporated by reference.

176.    Defendant BAXTER was negligent in the training, supervision and discipline of the Defendant Sheriff's Deputies, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons.

177.    Alternatively, the training BAXTER provided to the Sheriff's Deputies was inadequate.

178.    Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, BAXTER was negligent in failing to supervise or discipline any of his Sheriff's Deputies related to any force used protesters on those nights prior to Plaintiff's injury. BAXTER's negligence was the direct and proximate cause of Plaintiff's injuries.

179.    BAXTER's negligence in failing to supervise and discipline his Sheriff's Deputies was the direct and proximate cause of Plaintiff's injuries.

180.    As a result of the foregoing, Plaintiff suffered injuries and damages.

### NINTH CLAIM FOR RELIEF

### Negligent Planning of the Protest Response

### (Against BAXTER)

181.    All preceding and subsequent paragraphs are incorporated by reference.

182.    Defendant BAXTER was negligent in planning the response of his Sheriff's Deputies to the protests.

183.     BAXTER had a special duty to ensure that the rights of Plaintiff and other protesters to free speech, expression and to assemble under the First Amendment to the United States Constitution, and Article I, section 8 of the New York State Constitution, were not violated, and that protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement.

184.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested in the training of Sheriff's Deputies that what seem to be peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

185.    BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that violated the rights to free speech, expression and to assemble.

186.     BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that conflated peaceful protests and demonstrations with violent mobs and riots; thus, BAXTER knew or should have known that in the absence of a proper protest response plan, his Sheriff's Deputies would use unreasonable and excessive force against peaceful demonstrators, like Plaintiff.

187.     BAXTER breached his duty to Plaintiff and other protesters by implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons against protesters; however, based on national news reports in the months before the September protests, BAXTER knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities.

188.     BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would police violent mobs.

189.     BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons indiscriminately against protesters.

190.     BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to that they could shoot pepper balls and other "less-than-lethal" projectiles at protesters' heads.

191.     BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group

conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

192.    Plaintiff's injuries were a direct and proximate result BAXTER negligently planning the response to the protests.

193.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## TENTH CLAIM FOR RELIEF

### Negligent Training, Supervision and Discipline

### (Against the CITY)

194.    All preceding and subsequent paragraphs are incorporated by reference.

195.    The CITY and RPD were negligent in the training, supervision and discipline of the RPD officers, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons.

196.    Alternatively, the training the CITY provided to the RPD officers was inadequate.

197.    Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, the CITY was negligent in failing to supervise or discipline any of the RPD officers related to any force used protesters on those nights prior to Plaintiff's injury. The City's negligence was the direct and proximate cause of Plaintiff's injuries.

198.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## ELEVENTH CLAIM FOR RELIEF

### Negligent Planning of the Protest Response

### (Against the CITY)

199.    All preceding and subsequent paragraphs are incorporated by reference.

200.    The CITY and RPD were negligent in planning the response to the protests.

201.    The CITY had a special duty to ensure that the rights of Plaintiff and other protesters to free speech, expression and to assemble under Article I, section 8 of the New York State Constitution were not violated, and that protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement.

202.    For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released. During those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

203.    The CITY and RPD breached its duty to Plaintiff and other protesters by failing to implement any plan whatsoever for how to ensure that RPD officers protected and promoted protesters rights to free speech, expression and to assemble under Article I, section 8 of the New York State Constitution, and the New York Right to Monitor Act.

204.    The City and RPD breached its duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed RPD officers that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested in the training of RPD officers that what seem to be peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all protestors by collectively

punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

205.    The CITY and RPD breached its duty to Plaintiff and other protesters by implementing a protest response plan that affirmatively violated protesters' rights to free speech, expression and to assemble under First Amendment to the United States Constitution and Article I, section 8 of the New York State Constitution.

206.    The CITY and RPD breached its duty to Plaintiff and other protesters by implementing a protest response plan that instructed its officers to use extreme violence, militarized police tactics, military-grade weapons, and chemical weapons against protesters.

207.    The CITY knew or should have known that its protest plan was unlawful and that implementation of its plan would cause protesters rights to free speech, expression and to assemble under the First Amendment to the United States Constitution and Article I, section 8 of the New York State Constitution to be violated; and that RPD officers and other law enforcement officers would cause serious injuries to protesters.

208.    The CITY and RPD knew that at past protests, numerous RPD officers had seriously injured peaceful demonstrators; and that in the absence of a proper protest response plan, RPD officers would use unreasonable and excessive force against peaceful demonstrators and falsely arrest them.

209.    The CITY knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, such as menstrual irregularities—as same had been widely reported around the county in the months prior to the RPD's use of said chemical weapons in September 2020.

210.    The CITY breached his duty to keep demonstrators safe by, among other things, failing to implement a lawful protest response plan, and instead training RPD officers to police peaceful demonstrations in the same manner as they would police violent mobs or riots.

211.    The CITY breached its duty to keep demonstrators safe by implementing a protest response plan which, among other things, instructed RPD officers to use chemical weapons against protesters in the absence of individualized probable cause – despite knowing of the serious adverse health effects such chemical weapons would cause.

212.    The CITY breached its duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed RPD officers to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

213.    The CITY breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that failed to properly instruct RPD officers on their duty to intervene to prevent the violation of protesters rights by other RPD officers, Sheriff's Deputies, and/or other law enforcement officials.

214.    The CITY breached his duty to keep demonstrators safe by implementing a protest response plan that caused the violation of Plaintiff's rights in all other ways detailed herein.

215.    Plaintiff's injuries were a direct and proximate result of the CITY's implementation of its negligent a protest response plan.

216.    As a result of the foregoing, Plaintiff suffered injuries and damages

## TWELFTH CLAIM FOR RELIEF
### Negligence

**(Against the RPD Officers and Sheriff's Deputies)**

217.    All preceding and subsequent paragraphs are incorporated by reference.

218.    The Defendant RPD officers and Sheriff's Deputies, their agents, servants, employees, officers and deputies were negligent using the "less lethal" military grade weapons and chemical weapons against Plaintiff, which was the direct and proximate cause of Plaintiff's injuries.

219.    The Defendant RPD officers and Sheriff's Deputies had a duty to permit the protesters to engage in First Amendment Activities and to protect them from harm or physical violence.

220.    The Defendant RPD officers and Sheriff's Deputies had a duty to not use force against any individual protester in the absence of individualized cause or legal justification for the use of force.

221.    The Defendant RPD officers and Sheriff's Deputies breached that duty by firing "less lethal" munitions and chemical weapons into "groups" of protesters based on perceived "group conduct," without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

222.    The breach of that duty by the Defendant RPD officers and Sheriff's Deputies was the direct and proximately cause of Plaintiff's serious injuries described herein.

223.    Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

224.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

WHEREFORE and in light of the foregoing, Plaintiff demands judgment on all claims for relief:

a. Empanel a jury;

b. Award compensatory and punitive damages;

c. The Plaintiff demands the foregoing relief jointly and severally against all of the defendants in an amount in excess of the jurisdiction of all lower Courts, except that the punitive damages demands are, as a matter of law, not recoverable against a municipality and therefore are not made against the City;

d. Such other and further relief as the court may deem just and proper.

Dated:      New York, New York      Respectfully Submitted,
                 January 3, 2021

ROTH & ROTH, LLP.

~//s//~

_____

Elliot Dolby Shields
Co-counsel for Plaintiffs
192 Lexington Avenue, Suite 802
New York, New York 10024
(212) 425-1020

Donald Thompson
Co-counsel for Plaintiffs
16 West Main Street, Suite 243
Rochester, New York 14614
Ph: (585) 423-8290